# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

| | |
|---|---|
| RICHARD W. HUSKEY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BIRCH COMMUNICATIONS, INC.; ) <br> BIRCH TELECOM OF MISSOURI, INC.; ) <br> IONEX COMMUNICATIONS, INC.; and ) <br> R. KIRBY GODSEY, TONY TOMAE, JIM ) <br> O'BRIEN, CHRIS BUNCE, SCOTT MURPHY, ) <br> MICHELLE ANSLEY, PAUL MASTERS, ) <br> in their individual capacities and in their ) <br> representative capacities as officers/ ) <br> executives of Birch Communications, Inc.; ) <br> and DOES 1–10, ) <br> ) <br> Defendants. ) | Case No. _____ <br><br> **JURY TRIAL DEMANDED** <br><br> PLEASE HOLD SERVICE |

## **PETITION FOR DAMAGES**

1) Plaintiff Richard W. Huskey brings these claims against Defendants Birch Communications, Inc., Birch Telecom of Missouri, Inc., Ionex Communications, Inc., and R. Kirby Godsey, Tony Tomae, Jim O'Brien, Chris Bunce, Scott Murphy, Michelle Ansley, and Paul Masters, in their individual capacities and in their representative capacities as officers/executives of Birch Communications, Inc., and Does 1-10 (collectively, "Defendants").

2) The Defendants violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA"), by systematically employing a uniform telemarketing scheme to

unfairly enrich the Defendants through industrial-scale inducement and unconscionable collection of fees from residential telecommunications consumers, including Plaintiff.[1]

---

[1] Mo. Rev. Stat. §§ 407.010, .020.1, .025, .1070, .1073.2, .1076, .1082 (2008) provided in material part:

**Definitions.**
    407.010. As used in sections 407.010 to 407.130, the following words and terms mean:
    (1) "Advertisement", the attempt by publication, dissemination, solicitation, circulation, or any other means to induce, directly or indirectly, any person to enter into any obligation or acquire any title or interest in any merchandise;
    . . . .
    (4) "Merchandise", any objects, wares, goods, commodities, intangibles, real estate or services;
    (5) "Person", any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof;
    (6) "Sale", any sale, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash or on credit;
    (7) "Trade" or "commerce", the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property . . . and any other article, commodity, or thing of value wherever situated. The terms "trade" and "commerce" include any trade or commerce directly or indirectly affecting the people of this state.
**Unlawful practices . . . .**
    407.020.1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.
**Civil action to recover damages—class actions authorized, when—procedure.**
    407.025. 1. Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money . . . , as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.
    2. Persons entitled to bring an action pursuant to subsection 1 of this section may, if the unlawful method, act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class . . . In any action brought pursuant to this section, the court may in its discretion order, in addition to damages, injunction or other equitable relief and reasonable attorney's fees.
    . . . . [maintenance of action, other procedural provisions omitted]
**Definitions.**
    407.1070. As used in sections 407.1070 to 407.1085, the following terms shall mean:
    . . . .
    (7) "Material aspect or element", any factor likely to significantly influence the consumer's choice of, or conduct regarding, merchandise;
    (8) "Merchandise", any objects, wares, goods, commodities, intangibles, real estate or services . . . [charitable exception omitted];
    . . . .
    (11) "Seller", any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide merchandise to the consumer in exchange for consideration;
    (12) "Telemarketer", any person, or any recorded, computer-generated, electronically generated or other voice communication of any kind, who, in connection with telemarketing, initiates or receives telephone calls to or from a consumer. A telemarketer includes, but is not limited to, any such person that is an owner, operator, officer, director or partner to the management activities of a business;
    (13) "Telemarketing", a plan, program or campaign which is conducted to induce the purchase or lease of merchandise by use of one or more telephones and which involves more than one telephone call.
**Telemarketers, required disclosures . . . .**
    407.1073.2. Before a consumer pays for merchandise offered for sale through telemarketing, the telemarketer shall disclose, in a clear and conspicuous manner, the following:
    . . . .

## THE PARTIES

3) All Birch entities are operated by the same officers:

R. Kirby Godsey, Chairman of the Board, and citizen of Georgia;

Tony Tomae, President and CEO, and citizen of Georgia;

Jim O'Brien, Executive Vice President and COO, and citizen of Georgia;

Christopher Jon Bunce, Senior Vice President, Legal, Regulatory & General Counsel, and citizen of Iowa;

Scott Murphy, Vice President and CFO, and citizen of Georgia;

Michelle Ansley, Vice President and CAO, Human Resources, and citizen of Georgia;

Paul Masters, Senior Vice President of Alternate Channels, and citizen of Georgia.

4) According to Ionex's fiings with the Missouri Secretary of State, Ionex maintains its principal place of business and corporate headquarters at 2323 Grand Boulevard, Suite 925, Kansas City, Missouri.

---

(2) The total cost and quantity of the merchandise that is the subject of the telemarketing sales call;
(3) Any material restriction, limitation or condition to purchase, receive or use the merchandise that is the subject of a telemarketing sales call; [and]
(4) Any material aspect of the nature or terms of the refund, cancellation, exchange or repurchase policies, including the absence of such policies . . . .
**Unlawful telemarketing acts or practices.**
  407.1076. It is an unlawful telemarketing act or practice for any seller or telemarketer to engage in the following conduct:
  (1) Misrepresent any material fact required pursuant to section 407.1073. It is a defense to this subdivision if a seller or telemarketer shows, by a preponderance of the evidence, that the misrepresentation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error, and no civil penalties shall be imposed if this defense is met; [or]
  . . . .
  (10) Knowingly provide assistance or support to any telemarketer when that person knows or consciously avoids knowing that the telemarketer is engaged in any act in violation of sections 407.1070 to 407.1085 . . . .
**Penalties— . . . —civil damages.**
  407.1082. 1. It is unlawful pursuant to section 407.020 to violate any provision of sections 407.1070 to 407.1085 . . ., and pursuant to sections 407.010 to 407.130, the violator shall be subject to all penalties, remedies and procedures provided in sections 407.010 to 407.130. The remedies available in this section are cumulative and in addition to any other remedies available by law.
  . . . .
  3. In addition to the remedies already provided in sections 407.1070 to 407.1085, any consumer that suffers a loss or harm as a result of any unlawful telemarketing act or practice pursuant to section 407.1076 may recover actual and punitive damages, reasonable attorney's fees, court costs and any other remedies provided by law.

5) According to the Missouri Secretary of State, Telecom also maintains its principal place of business and corporate headquarters at the same location as Ionex, 2323 Grand Boulevard, Suite 925, Kansas City, Missouri.

6) Mr. Huskey is and at all relevant times was a citizen of Missouri residing at 2821 Arnold Avenue, Saint Louis County.

### VENUE AND JURISDICTION

7) Venue and jurisdiction are proper in this Court. Mr. Huskey resides in St. Louis County, Missouri, the tortious actions occurred in St. Louis County, and the injuries were suffered in St. Louis County.

8) This Court has personal jurisdiction over Birch Defendants because they are citizens of the geographic scope of this court, and/or, in the case of the individual Defendants, systematically and continuously do business in the geographic scope of this court.

9) This Court has personal jurisdiction over each of the individual defendants by their employment by, direction and/or work within Missouri and/or through a company based and headquartered in Missouri. The individual Defendants each have systematic and continuous business contacts with St. Louis County, Missouri, such that each reasonably could expect to be called into this court. This action arises out of Defendants' activities under the geographic scope of this court.

## GENERAL ALLEGATIONS

10) Prior to soliciting Plaintiff, Defendants already had initiated a deceptive marketing scheme that began by their "cold-calling" consumers; in or around the second week of April 2014, Plaintiff became the victim of such a "cold call."

11) When Plaintiff answered the phone, Defendants' sales representative delivered a highly-misleading, uniform, Defendant-developed "scripted" sales pitch ("Initial Call").

12) The Initial Call was inherently high-pressure, to force a consumer into orally agreeing to terms with the Defendants during the same conversation.

13) Through this tactic, the Defendants confused Plaintiff into believing that Birch was "affiliated" with AT&T and/or that the purpose of the call was simply to save him money.

14) Due to the Initial Call's speed and deceptive words the Defendants used in their uniform script, Plaintiff had no idea he was changing carriers or entering a contract with Birch. Following the Initial Call, Plaintiff was quickly pushed into an automated third-party verification ("TPV") procedure that instructed him to answer "yes" to multiple leading questions, purportedly confirming his agreement to a so-called online "Master Services Agreement" (collectively; along with the "corresponding supplements," the "BirchNet Services Supplement" and the "Birch Residential Service Supplement"; hereinafter, the "MSA") he had never seen. A true and correct copy of the MSA used for Plaintiff and effective at all times Plaintiff did business with Defendants is attached as **Exhibit A**. (The MSA was subsequently removed and replaced by Birch after Plaintiff initially filed this lawsuit; Exhibit A was downloaded as a ".pdf" file from Birch's website (www.birch.com), approximately one year following the events delineated herein (4/29/15)).

15) The TPV and the Initial Call omitted, suppressed and/or concealed the MSA's terms. The Initial Call, in fact, was so insidious that the Defendants had a practice of erasing and/or not recording Initial Calls.

16) By failing to disclose material terms in the MSA, and to make disclosures required by Mo. Rev. Stat. § 407.1073.2 ("(2) The total cost and quantity...; (3) Any material restriction, limitation or condition to purchase, receive or use the [service]...; (4) Any material aspect of the nature or terms of the refund, cancellation, exchange or repurchase policies, including the absence of such policies"), the Defendants convinced Plaintiff to enter, without viewing or signing, a purported agreement, the MSA, containing terms so onerous and one-sided as to be unconscionable as a matter of law.

17) Plaintiff relied to his detriment in agreeing to terms based on the Defendants' materially incomplete representations. Specifically, the Defendants misrepresented the value of their services and concealed, suppressed and/or omitted their exorbitant installation fees, monthly fees, and termination fee that Plaintiff would be billed for and would cause him to endure collection processes if not paid.

18) Defendants' use of the Initial Call, the TPV call, the terms of the MSA, and Defendant's subsequent bad-faith "enforcement" of those terms against Plaintiff constituted the use or employment of unconscionable term[s] in connection with the sale to Plaintiff, which was an unfair practice, and a *per se* violation of the MMPA. *See* 15 Mo. C.S.R § 60–8.080(1) (2011) ("It is an unfair practice for any person in connection with the sale of merchandise[2] to . . . use any unconscionable contract or contract term.").

---

[2] "Merchandise" includes services, *see* 15 Mo. C.S.R § 60–8.080 n. (associating this regulation with Mo. Rev. Stat. chap. 407); Mo. Rev. Stat. § 407.010(4).

19) After speaking with the Birch representative during the April 2014 Initial Call and agreeing that he would like to "save money" on his telephone bill, Plaintiff promptly was transferred to a TPV provider, with whom he putatively orally agreed, merely by responding affirmatively to a quick succession of questions, to change telephone carriers to Birch, and to enter into a long-term contract with Birch for local telephone service, subject to the undisclosed terms of the MSA.

20) Birch's TPV procedure, as of three months prior, had been declared in violation of the Federal Communications Commission prohibition against "slamming," the submission or execution of an unauthorized change in a subscriber's selection of a provider of telephone exchange service or telephone toll service. (*See* **Exhibit B**.) The Defendants had not corrected the violations prior to contacting Plaintiff.

21) Neither during the Initial Call nor during the TPV procedure did the Defendants reveal to Plaintiff the material, unexpected, onerous, and one-sided terms of the MSA.

22) A few days after receiving Birch's telephone calls, Plaintiff received an undated, form letter via regular mail from Birch (the "Initiation Letter"). A true and correct copy (with Plaintiff's handwritten annotations) is attached as **Exhibit C**.

23) The Initiation Letter, from a "Director" of "Birch Customer Service," shows a "Contract Start Date" of March 19, 2014 for 12 months of Birch's "BirchNet Supplement" product—local intrastate voice telephone service.

24) <u>The terms effectively were unreadable at the purported time of contracting:</u> It is beyond dispute that the Defendants did not provide Plaintiff with a copy of the MSA prior to his purportedly agreeing to be bound to its terms during the Initial Call and TPV—

i) The Initiation Letter provided as follows:

> Please visit the Customer Tools section on our web site to find helpful links for setting up your voice mail, reviewing your Birch billing information, and setting up your e-mail account (if applicable). To view the Birch Master Services Agreement and Service Supplements that pertain to your service go to www.birch.com/about/msawelcome.aspx.
>
> **I would also like to draw your attention to an additional savings opportunity.** The Birch Referral Program will provide you a $75 credit for each customer you refer to Birch. There is no limit to the customers you refer and the savings you'll receive! For more information go to www.birch.com/referral.
>
> **Birch also provides Birch Breeze wireless Internet service allowing you to stay connected and productive, no matter where your day takes you.** Plans start at $9.95 per month. To find out more about how you can increase your productivity with Birch Breeze go to www.birch.com/about/birch_breeze.aspx.

(Ex. C (emphasis in original).) By providing instructions as to how a customer might view the MSA, the Initiation Letter confirms on its face that a copy of the MSA was not mailed along with the Initiation Letter to the Plaintiffs.

ii) Moreover, the very location of the Initiation Letter's reference to the MSA, using bolding and emphasis *surrounding* the reference to the MSA, but not on the reference itself, to effectively deemphasize the reference, adds to the deceptive nature of the alleged MSA contract-making process. In any case, the URL given in the Initiation Letter, was at all relevant times, and until at least April 29, 2015 (more than one-year following Plaintiff's receipt of the initiation letter) a broken link, requiring a consumer to search through Birch's online website for the MSA. *See* **Exhibit E**. Defendants repaired the link after Plaintiff first filed this lawsuit.

iii) In any event, the Initiation Letter, sent via regular mail, appears not to account for the possibility that a customer may lack internet access in the first place; presumably, the best such customer could do is to call Birch and request a copy of the MSA—resulting in the unreasonably short "Buyer's Remorse" period (discussed in para. 29 *infra*) likely expiring during the inevitable delay.

Case: 4:17-cv-02415 Doc. #: 1-2 Filed: 09/15/17 Page: 10 of 32 PageID #: 21

25) In light of the MSA's onerous terms, Plaintiff's inability to promptly view it was particularly prejudicial because the MSA purports to be self-executing, stating in its first substantive paragraph: "Use of services constitutes acceptance and agreement to [the MSA]" (Ex. A); the MSA attempted to cure this problem of naive consumers coerced into terms sight-unseen, by fiat: "BY SIGNING THIS AGREEMENT OR USING BIRCH SERVICES, CUSTOMER ACKNOWLEDGES IT HAS HAD AN OPPORTUNITY TO REVIEW THE TERMS REFERENCED HEREIN AND AGREES TO SUCH TERMS"—this is obvious false pretense, as prohibited by Mo. Rev. Stat. § 407.020.1. Birch included substantively identical provisions in the "Residential Service Supplement," also referred to as the "Residential Services Agreement" ("RSA") portion of the MSA.

26) The Defendants created a situation where the Plaintiff, or any customer, most likely had no choice but to use Birch's service, thus purportedly "agreeing to" the MSA, in order simply to investigate the MSA's whereabouts. The MSA, thus, is not just a contract of adhesion, it is the most extreme and paradoxical example of one; Plaintiff was only able to review the terms of the MSA after he purportedly had already reviewed and accepted it—Plaintiff got no opportunity to bargain, but instead was surprised by a take-it-or-take-it predicament.

27) The Initiation Letter also stated: "An early termination fee of up to 50% of your remaining contract amount may apply . . . if you cancel service before your contract end date. Contract is set to automatically renew." (Ex. C.) In light of the MSA's *actual* termination fee penalties (which were much greater), this statement is patently deceptive. When he canceled his service with Birch in mid-June of 2014, Mr. Huskey's remaining bills, had he kept the service, would have totaled approximately $45 per month, or $450 total, making the

MSA's termination fee of $450, or "$50 times months remaining" (Ex. A), approximately *100%* of the remaining contract.

28) Incredibly, the First Termination Fee Letter, which Mr. Huskey received dated June 12, 2014, admits that the Defendants had not informed him of the high termination fee that it would foist on him: "*You may not be aware* that by leaving us you have terminated your contract early, thereby generating an early termination fee." (Ex. D (emphasis added).) Moreover, the Defendants' sending Termination Fee letters, in an attempt to cause a customer to pay an unreasonable fee, is in and of itself an unfair practice as contemplated by the MMPA.

29) <u>The "Buyer's Remorse" period was unconscionably short:</u>

i) Having found themselves in the MSA's self-executing "trap", Plaintiff and other Birch customers had an objectively unreasonable time period in which to potentially escape that trap by cancelling Birch's services.

ii) The "BirchNet Services Supplement" ("BSS") portion of the MSA provided: "Buyer's Remorse. . . . [Y]ou must contact Birch within five . . . days of the[ ]Signature[ ]Date of[ ]the MSA to request . . . cancellation. If you cancel after[ ]that[ ]date, you will owe Birch a fee for early termination, and[ ]installation charges[ ]will apply." (Ex. A at 3.) Even more harshly, the RSA provided for only a three-day "Buyer's Remorse" period for *residential* customers, such as Plaintiff. (*Id.* at 8.) Stated otherwise: the less technologically-sophisticated a potential consumer (*i.e.*, a multiple-account business versus a residential, local telephone service consumer), the more onerous the terms of the MSA.

iii) The MSA's harshest terms are reserved for those customers least likely to have prompt, cost-free access to relevant information and resources (such as the MSA itself).

Case: 4:17-cv-02415-JAR Doc. #: 3 Filed: 09/18/17 Page: 11 of 13 PageID #: 257

30) <u>The MSA enabled Birch to "adjust" prices unilaterally:</u>

The MSA provided that "Birch reserves the right to adjust Customer pricing following delivery of notice to Customer as required[ ]by the applicable[ ]state public utility commission where Services are provided, or with thirty . . . days' notice, whichever is greater" (*id.* at 1). By allowing Birch to unilaterally change its price with a month's notice, this provision renders the contract illusory and, therefore, would not be anticipated by a consumer and is objectively unreasonable.

31) Pursuant to *State ex rel. Ashcroft v. Mktg. Unltd. of Am., Inc.*, 613 S.W.2d 440 (Mo. Ct. App. 1981), and its progeny, the individual Defendants are liable for having used or employed, and/or directed others to use or employ, Birch's website and resources to design, write, place, publish and/or maintain unconscionable language; and for having assisted or supported the corporate Defendants' unlawful conduct. *See generally* Mo. Rev. Stat. §§ 407.010(5) (definition of "Person"), 407.1076(10). It is impossible for Birch's highest-level executives to have been unaware of Birch's primary customer-contracting mechanism that had been in place for multiple years.

## COUNT I

### *Per Se* Violation of the MMPA Based on Regulation

32) Plaintiff incorporates all preceding allegations herein.

33) The MSA is both procedurally and substantively unconscionable.

34) The Defendants possessed bargaining strength and power that was far superior to that of Mr. Huskey.

35) Without any negotiation, the Defendants coerced Plaintiff into putative agreement to the MSA, a contract of adhesion that is substantially one-sided and unconscionable in Birch's favor; Plaintiff was consequently damaged.

36) The Defendants committed a *per se* violation of the MMPA by using and/or employing the unconscionable terms of the Initial Call, the TPV call, and/or the MSA in connection with the sale of services in trade or commerce, in direct contravention of 15 Mo. C.S.R. § 60–8.080, pursuant to which unconscionability entails a *per se* unfair practice which is *ergo* a violation of MMPA, particularly Mo. Rev. Stat. § 407.020.1, inasmuch as 15 Mo. C.S.R. § 60–8.080 draws its authority from, and was promulgated to enforce, the MMPA.

### COUNT II

### Violation of the MMPA—General

37) During the course of and in connection with the consumer transactions delineated herein, the Defendants, in using the Initial Call, the TPV call, and/or the MSA to attempt to collect fees from Plaintiff, acted with, used, or employed deception, fraud, false pretense, false promise, misrepresentation, and/or unfair practice and/or concealed, suppressed, and/or omitted material facts; thereby violating the MMPA, particularly Mo. Rev. Stat. § 407.020.1.

## SUMMARY AND PRAYER FOR RELIEF

38) But for the Defendants' unlawful actions and failures, Plaintiff would not have entered into the MSA. Plaintiff reasonably relied on the Defendants' behavior in concealing the unconscionable contractual terms to the extent he purportedly agreed to the MSA.

39) As a direct result of the Defendants' contravention of the MMPA, Plaintiff has been aggrieved and accrued ascertainable damages including, *inter alia*: (a) the installation and monthly costs for a service that was much less valuable than represented (roughly $300); (b) "early termination fee(s)," followed by Plaintiffs' having their accounts turned over to bill collectors, damaging their credit if they refuse to pay; and (c) attorneys' fees and expenses in bringing this action (roughly $85,000 as of the present filing).

40) Plaintiff requests as the appropriate remedy judgment in his favor and against the Defendants, ordering the following remedies under the MMPA:

(a) compensation for the ascertainable damages listed *supra;* (b) attorney's fees and other expenses incurred due to the Defendants' conduct; and (c) punitive damages to the greatest extent allowed by law.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: */s/ Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*